Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391
TELEPHONE 602.229.5200

Attorneys for Defendant New NGC, Inc. d/b/a
National Gypsum Company

Brian R. Booker (#015637)
Brian.Booker@quarles.com
Alison Pulaski (#025699)
Alison.Carter@quarles.com

Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
TELEPHONE 215.963.5000

James D. Pagliaro (*admitted pro hac vice*)
jpagliaro@morganlewis.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raymond Yee, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>National Gypsum Company, et al.,<br><br>    Defendants. | NO. 3:09-cv-08189-DGC<br><br>**MOTION TO DISMISS OF NEW NGC, INC. D/B/A NATIONAL GYPSUM COMPANY**<br><br>[Assigned to the Hon. David G. Campbell] |

Defendant New NGC, Inc., doing business as National Gypsum Company ("National Gypsum"), respectfully moves the Court to dismiss Raymond Yee's ("Plaintiff's") Amended Complaint ("Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). This Motion is supported by the attached Memorandum of Points and Authorities.

QB\10136107.1

1   DATED this 9th day of April, 2010.

2                                          QUARLES & BRADY LLP
                                           Renaissance One
3                                          Two North Central Avenue
                                           Phoenix, AZ  85004-2391
4

5                                          By */s/ Alison Pulaski*
                                              Brian R. Booker
6                                              Alison Pulaski

7                                          *Attorneys for Defendant* New NGC, Inc. d/b/a
                                           *National Gypsum Company*
8

9                   **MEMORANDUM OF POINTS AND AUTHORITIES**

10  **I.      INTRODUCTION**

11          For more than eighty years, National Gypsum's drywall has been used in the

12  construction of American homes and commercial buildings.  This lawsuit is the first to

13  allege National Gypsum's drywall is defective because it "emits, among other things, high

14  levels of sulfur." (Am. Compl. ¶¶ 1, 8, 16).  The Amended Complaint's allegations are

15  cribbed from those advanced in MDL No. 2047, *In re: Chinese-Manufactured Drywall*

16  *Products Liability Litigation*, where more than 3,000 plaintiffs allege that drywall

17  manufactured in China emits excessive amounts of sulfur.  National Gypsum is not a party

18  to MDL No. 2047, and it has not sold or distributed *any* drywall manufactured in China.

19  Plaintiff has not alleged otherwise.   Nonetheless, Plaintiff seeks to repackage the

20  allegations in the Chinese-manufactured drywall litigation and direct them toward

21  National Gypsum's drywall, a different product that is designed, manufactured and sold

22  independent of Chinese manufacturers and their affiliates.

23          The allegations in the Amended Complaint are without factual or scientific basis.

24  Instead, Plaintiff's allegations are based on mere speculation that the problems associated

25  with Chinese-manufactured drywall are also tied to National Gypsum's drywall.   The

26  Amended Complaint's allegations are thus frivolous at worst, premature at best.  By way

27  of background, the U.S. Consumer Product Safety Commission ("CPSC") is leading a

28

-2-

multi-agency investigation of assertions regarding allegedly defective drywall in the United States:

> CPSC is leading a federal drywall team to investigate the corrosion and health issues presented by the imported drywall. The federal team, which includes the Environmental Protection Agency (EPA), the Centers for Disease Control and Prevention (CDC)/Agency for Toxic Substances and Disease Registry (ATSDR), the U.S. Department of Housing and Urban Development (HUD), and U.S. Immigration and Customs Enforcement (ICE), coordinates regularly with state partners, including state departments of health and attorneys general. CPSC, EPA, CDC/ATSDR, HUD and ICE have weekly calls to discuss and share information about the investigation and to review technical data. Since the beginning of the investigation, it has been apparent that some answers to the cause of the drywall problem will have to come from sources in China through cooperation with the Chinese government. . . .
>
> [T]he CPSC will continue to work aggressively with its federal partners for scientific data that links specific emissions from the drywall to the reported corrosion and health issues.

CPSC, *Imported Drywall Fact Sheet* (Sept. 2009) (attached as Exhibit 1), *available at* http://www.cpsc.gov/info/drywall/oct2009status.pdf.[1]   No government report has concluded that National Gypsum drywall has caused, or can cause, the conditions that are reportedly present in homes with problematic Chinese-made drywall.   Further, the governmental analyses performed to date report a clear difference between the composition of samples of Chinese-manufactured drywall and National Gypsum drywall:

> [F]our samples of U.S.-manufactured drywall were purchased by EPA from local stores in Edison, New Jersey and included in the analysis . . . Sulfur was detected at 83 parts per million (ppm) and 119 ppm in the Chinese drywall samples.  Sulfur was not detected in the four US-manufactured drywall samples . . . The drywall sample manufacturers and product

---

[1] When examining a Rule 12(b)(6) motion to dismiss, courts may consider "matters of which a court may take judicial notice." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Government publications are the proper subject of judicial notice. *See, e.g., Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1133-34 (9th Cir. 2008) (taking judicial notice of governmental publication); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 978 (9th Cir. 2007) (same). In addition, the multi-agency government investigation and related publications may be considered at the motion to dismiss stage because the Amended Complaint expressly references them. *See, e.g.*, Am. Compl. ¶¶ 10, 15.

QB\10136107.1

1  names are as follows: US Gypsum/Hamilton (US); PROROC/Certainteed (US); National Gypsum/Gold Bond (US); GP/Tough Rock (US); Knauf/33928-2005 (China); and MIC/33966-12077 (China).

U.S. EPA, *Drywall Sample Analysis* (May 7, 2009), at 1-3 (emphasis added) (attached as Exhibit 2), *available at* http://www.epa.gov/oswer/docs/chinesedrywall.pdf.

A study commissioned by the Florida Department of Health reiterated this distinction:

> In summary, the odor that has been described by investigators and homeowners in Florida residences originated from the emission of volatile sulfur compounds. There is a distinct difference in drywall that was manufactured in the United States and those that were manufactured in China. The Chinese samples contained traces of strontium sulfide inclusions and more organic material than the [National Gypsum] Gridmarx sample (United States). However, it is not yet known if either contributed to the odor. The Chinese samples give off a sulfur odor when exposed to extreme heat and moisture.

Unified Engineering, Inc., *Report on Florida Drywall Samples* (Mar. 17, 2009) (Commissioned by Florida Dep't of Health), at 5 (emphases added) (attached as Exhibit 3), *available at* http://www.myfloridaeh.com/community/indoor-air/drywall.html.

Most recently, the CPSC reported additional testing results showing important differences in the composition of Chinese-manufactured drywall compared to American-made drywall:

> U.S. Consumer Product Safety Commission (CPSC) staff contracted with Lawrence Berkeley National Laboratory (LBNL) for measurement of chemical emissions from 30 samples of drywall products obtained as part of an investigation of imported (Chinese) drywall. In this report, non-Chinese drywall is referred to as North American or NA. . . . .
>
> While the data provided by LBNL to date are limited and the sample size is small, these data provide important information about chemicals that may be emitted from older Chinese drywall but are not released from NA drywall. Based on these preliminary results, the most salient difference between older Chinese and NA drywall is in the number and amount of reactive sulfur compounds emitted.

QB\10136107.1

*CPSC Staff Preliminary Evaluation of Drywall Chamber Test Results – Reactive Sulfur Gases* (March 2010), at 2-3 (emphasis added) (attached as Exhibit 4), *available at* http://www.cpsc.gov/info/drywall/index.html; *see also* Garland & Greene, Division of Hazard Analysis, CPSC, *Statistical Analysis of the Chemical Screening of a Small Sample of Unused Chinese and Non-Chinese Drywall* (10/28/09 Draft), at 10 (attached as Exhibit 5), *available at* http://www.cpsc.gov/info/drywall/TabA.pdf ("[A]ll the measurements of elemental sulfur in non-Chinese drywall samples were non-detects, while in contrast, only one measurement in the Chinese drywall gypsum samples and one in the Chinese drywall paper samples was a non-detect.").

Finally, with respect to the health-related component of the investigation, the CDC and CPSC have not identified scientific evidence that establishes a causal link between even problematic Chinese-manufactured drywall and reported health complaints:

> CPSC is leading the federal investigation into complaints about imported drywall. . . . CDC and ATSDR are working with other federal and state agencies to identify what chemicals are in the drywall and <u>if</u> these chemicals are a health risk to persons living in homes containing this drywall. . . .
>
> State and federal agencies are testing the air inside some homes in Florida, Louisiana, Virginia, Alabama, and Mississippi. They are testing homes in which homeowners suspect they have contaminated drywall and, for comparison, other homes in which no problems have been reported. <u>State and federal agencies will evaluate these results to determine whether there is a health problem</u>. . . . <u>Until federal agencies get more information from the indoor air testing, it is not possible to determine if the symptoms people are experiencing are possibly from drywall.</u>

CDC, *Imported Drywall and Your Home* (2009) (emphasis added) (attached as Exhibit 6), *available at* http://www.cdc.gov/nceh/drywall/; *see also* CPSC, *Drywall Information Center* (attached as Exhibit 7), *available at* http://www.cpsc.gov/info/drywall/faqs.html ("We are aggressively investigating if scientific evidence exists linking chemical emissions from the [imported] drywall to the reported health complaints. At this time, however, any such relationship or long-term health effects are unknown.").

1    Although none of the government reports has concluded that National Gypsum

2    drywall has caused, or can cause, the conditions that are present in homes with

3    problematic Chinese-made drywall, Plaintiff hypothesizes that National Gypsum's

4    drywall caused him the same type of damage and injury that have been reported with

5    Chinese-made drywall.  Not only that, but Plaintiff seeks certification of a class of "[a]ll

6    owners and residents of homes in the United States that contain defective Drywall

7    manufactured or sold by Defendants that emits excessive amounts of sulfur as well as any

8    individual or entity that paid for or performed repairs of any damage caused by the

9    drywall." (Am. Compl. ¶ 16).

10       Plaintiff's original complaint was based entirely "upon information and belief." For

11   this reason, National Gypsum moved to dismiss that complaint based on *Bell Atlantic*

12   *Corporation v. Twombly*, 550 U.S. 544 (2007), and other Rule 12(b)(6)-based

13   shortcomings.  In response, Plaintiff filed an Amended Complaint that jettisoned the

14   global "information and belief" disclaimer and several of his legal claims.  The Amended

15   Complaint advances claims of negligence, breach of implied warranties, strict products

16   liability, and unjust enrichment.  A close review of the allegations, however, establishes

17   that Plaintiff has still failed to state a claim for relief under any of these theories, and

18   therefore the Amended Complaint should be dismissed with prejudice.

19       *First*, the Amended Complaint fails to state a claim for relief as to its only named

20   plaintiff because it fails to state a plausible claim that Plaintiff's alleged injury and

21   damages – "bloody noses, headaches, insomnia, and a multitude of respiratory and sinus

22   issues" (Am. Compl. ¶ 11), "lighting failure" and a computer "failure" (*id.* ¶ 12) – were

23   *caused by* National Gypsum's drywall.  Indeed, even though Plaintiff has commissioned

24   "independent testing" of his drywall (Am. Compl. ¶ 11), his Amended Complaint lacks

25   any allegation that National Gypsum's drywall – as opposed to drywall manufactured by

26   another company or some other source altogether – is the cause of the "sulfide gases" that

27   he claims resulted in his damages and injuries.  Given Plaintiff's failure to plausibly allege

28   causation, each count in the Amended Complaint fails to rise above the level of

QB\10136107.1

1   "speculative," "conceivable" or "possible" to "state a claim to relief that is plausible on its

2   face," as required by *Twombly*, 550 U.S. 544.  Plaintiff is not entitled to take discovery

3   based on such tenuous allegations.

4        *Second*, Arizona's privity requirement precludes Plaintiff from pursuing claims for

5   breach of implied warranty (Count II) against National Gypsum.

6        *Third*, the Amended Complaint fails to state a claim for unjust enrichment (Count

7   IV) because (1) it fails to allege that Plaintiff conferred any benefit upon National

8   Gypsum; (2) it advances a novel, "quasi-tort" theory that is not cognizable as a matter of

9   law; and (3) even if this theory were cognizable, the unjust enrichment claim is predicated

10  upon deficient tort claims and cannot stand alone once these underlying claims are

11  dismissed.

12  **II.**    **PERTINENT ALLEGATIONS IN THE AMENDED COMPLAINT**

13       The Amended Complaint alleges in pertinent part that:

14
15  > Plaintiff made renovations to his home beginning in 2008
16  > using defective Drywall manufactured by Defendant National
    > Gypsum and purchased from Defendant Lowe's.  Plaintiff
    > purchased defective Drywall from the Lowe's store in Lake
17  > Havasu, Arizona in May 2008.  Plaintiff subsequently
    > installed the defective Drywall in his home and sustained
    > damages to his home, personal property and those residing in
18  > the home.

19  (Am. Compl. ¶ 4).  Plaintiff alleges nothing more than the *mere presence* of National

20  Gypsum drywall in a property that allegedly sustained "damages."  The Amended

21  Complaint later alleges that Plaintiff experienced "lighting failure" and a computer

22  "failure" (*id.* ¶ 12), but it never alleges that drywall sold by National Gypsum *caused*

23  Plaintiff's alleged property damage.

24      As to his claims of personal injury, Plaintiff alleges that he experienced "bloody

25  noses, headaches, insomnia, and a multitude of respiratory and sinus issues." (*Id.* ¶ 11).

26  According to Plaintiff, a September 2009 CDC publication entitled "Imported Drywall

27  Health – A Guide for Healthcare Providers" (the "Guide") (attached as Exhibit 8),

28  *available at* http://www.cdc.gov/nceh/drywall, "instructs" that exposure to sulfur gas can

QB\10136107.1

1   result in some of Plaintiff's alleged symptoms. Despite acknowledging a *possibility* of a

2   causal connection in the context of discussing Chinese-manufactured drywall, however,

3   the Guide states: "At this time, not enough information exists to determine the nature and

4   magnitude of a potential health risk." *Id.* Accordingly, like the causation deficiencies in

5   the property damage allegations, the Amended Complaint fails to allege a plausible causal

6   nexus between National Gypsum drywall and Plaintiff's alleged personal injury.

7        Plaintiff also alleges that "independent testing commissioned by counsel" revealed

8   carbonyl sulfide levels in "Plaintiff Yee's drywall" of 190 parts per billion and carbon

9   disulfide levels of 55 parts per billion. (Am. Compl. ¶¶ 11, 15). However, the Amended

10   Complaint fails to allege that it was *National Gypsum* drywall that was tested and

11   reportedly released these gases.

12        Simply put, the Amended Complaint fails to state a plausible claim for relief under

13   any of its legal theories.

14   **III.   LEGAL STANDARD**

15        A court should dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6)

16   where a plaintiff fails to allege facts that are sufficient to establish all of the essential

17   elements of its claims. *See generally Twombly*, 550 U.S. 544.

18        "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

19   accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

20   129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility

21   standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully;"

22   rather it demands sufficient factual allegations for "the court to draw the reasonable

23   inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-50. "Where

24   a complaint pleads facts that are 'merely consistent with'" a defendant's liability, it "stops

25   short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

26   (quoting *Twombly*, 550 U.S. at 557).

27        The U.S. Supreme Court recently elaborated upon the "[t]wo working principles"

28   that underlie *Twombly*:

QB\10136107.1

1
2
3
4
5
6
7
8
9

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has    alleged – but it has not "shown" – that the pleader is "entitled to relief."

10

*Id.* (emphases added).   "It is no answer to say that a claim just shy of a plausible

11

entitlement can be weeded out early in the discovery process." *Twombly*, 550 U.S. at 559.

12

## IV.   ARGUMENT

13

### A.   The Amended Complaint Fails To State A Plausible Claim For Relief Under *Twombly* and *Iqbal.*

14

15

The Amended Complaint fails to state a claim for relief under *Twombly* and *Iqbal*

16

because it fails to allege facts to permit a plausible inference that Plaintiff's alleged

17

damages and injury were caused by National Gypsum drywall.[2]

18

---

19
20
21
22
23
24
25

[2] Plaintiff appears to assert his individual claim under Arizona law.  National Gypsum does not agree that Arizona law would apply nationwide to the claims of all putative class members, many of whom have no contacts with Arizona.   With respect to Plaintiff's individual claim, however, he alleges that (a) he is an Arizona resident who purchased drywall at a Lowe's store located in Lake Havasu, Arizona (Am. Compl. ¶ 4); (b) he installed the drywall at his home in Yucca, Arizona; and (c) damages occurred to his Arizona home (*id.*).     Further, Plaintiff alleges that "material omissions and misrepresentations and breaches of warranties" by National Gypsum "emanat[ed]" from Arizona. (*Id.* ¶ 3). *See, e.g., Bernal v. Daewoo Motor America, Inc.*, No. 09-1502, 2009 WL 3837195, at *2 (D. Ariz. Nov. 16, 2009) (applying Arizona law where Arizona is "central" to the litigation); *Vint v. Element Payment Servs.*, No. 09-00078, 2009 WL 1749605, at *2-3 (D. Ariz. June 18, 2009) (same).   Accordingly, National Gypsum's Motion to Dismiss addresses Arizona law.

26
27
28

Under Arizona law, causation is a required element of each legal claim advanced by Plaintiff. *See Taeger v. Catholic Family & Cmty. Servs.*, 995 P.2d 721, 730 (Ariz. Ct. App. 1999) (negligence); *Dietz v. Waller*, 685 P.2d 744, 749 (Ariz. 1984) (breach of implied warranty); *Southwest Pet Prods., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1051 (D. Ariz. 2003) (strict products); *Martinelli v. Petland, Inc.*, No 09-529, 2009 WL 2424655, at *6 (D. Ariz. Aug. 7, 2009) (unjust enrichment).

QB\10136107.1

1    First, the Amended Complaint alleges that Plaintiff experienced "lighting failure"

2  and a computer "failure" (Am. Compl. ¶ 12), but it never alleges that drywall sold by

3  National Gypsum *caused* Plaintiff's alleged property damage.  Indeed, even after Plaintiff

4  commissioned "independent testing" of his drywall (*Id.* ¶ 11), his Complaint lacks any

5  allegation that National Gypsum's drywall – as opposed to drywall manufactured by

6  another company or some other source – is the cause of the gases that he claims resulted

7  in his damages.[3]  Instead, Plaintiff alleges only that a lighting failure and computer failure

8  occurred in rooms that contain allegedly "defective Drywall." (*Id.* ¶ 12).  Alleging the

9  mere presence of "defective Drywall" – without connecting that allegation to National

10  Gypsum and without alleging facts to permit a plausible inference that National Gypsum

11  drywall caused plaintiff's alleged property damage – falls short of the requirements of

12  *Twombly* and *Iqbal*.

13    As to personal injury, Plaintiff alleges that he experienced "bloody noses,

14  headaches, insomnia, and a multitude of respiratory and sinus issues." (*Id.* ¶ 11).

15  Plaintiff's alleged injury consists of common symptoms that could have many causes or

16  be idiopathic.  According to Plaintiff, however, the Guide "instructs" that exposure to

17  sulfur gas can result in some of Plaintiff's alleged symptoms.  Although the Guide

18  acknowledges a *possibility* of a causal connection, *Twombly* requires more than a

19  possibility before opening the doors of discovery.  *See Iqbal*, 129 S. Ct. at 1950 (stating

20  pleadings are insufficient "where facts do not permit the court to infer more than the mere

21  possibility of misconduct"); *Twombly*, 550 U.S. at 557-58 (noting "something beyond the

22  mere possibility of loss causation must be alleged").  Further, the Guide relied on by

23  Plaintiff contradicts Plaintiff's speculation regarding causation:  "At this time, not enough

24  information exists to determine the nature and magnitude of a potential health risk."

25  CDC, *Imported  Drywall  Health  –  A  Guide  for  Healthcare  Providers,  at*

26  ───────────────────────────────────

27  [3] The Guide referenced in the Amended Complaint observes that carbonyl sulfide and
carbon disulfide gases "occur naturally in the environment," and "[c]igarette smoke,
28  septic tanks, wastewater treatment, and automobiles also emit these compounds." *Id.* at 2.

http://www.cdc.gov/nceh/drywall; *see also* CPSC, *Drywall Information Center*, *at* http://www.cpsc.gov/info/drywall/faqs.html ("We are aggressively investigating if scientific evidence exists linking chemical emissions from the [imported] drywall to the reported health complaints.  At this time, however, any such relationship or long-term health effects are unknown.").  Because Plaintiff's allegations establish at best only a theoretical possibility that his symptoms could have been caused by his drywall, Plaintiff has failed to state a plausible claim for relief.[4]

**B.    Arizona's Privity Requirement Bars Plaintiff's Claims For Breach Of Implied Warranty Against National Gypsum (Counts II).**

Plaintiff's claim for breach of "implied warranties" should be dismissed because Plaintiff has failed to allege that he is in privity of contract with National Gypsum.  Under Arizona law, privity of contract is required for claims alleging breach of implied warranty of merchantability.  *See Flory v. Silvercrest Indus.*, 633 P.2d 383, 387 (Ariz. 1981); *see also, e.g., Haughland v. Winnebago Indus.*, 327 F. Supp. 2d 1092, 1097 (D. Ariz. 2004).[5]  Here, Plaintiff alleges that he purchased drywall from Lowe's, not from National Gypsum.  (Am. Compl. ¶ 4).  Accordingly, Plaintiff's implied warranty claim against National Gypsum should be dismissed.

---

[4] In addition, although Plaintiff alleges that "testing of Plaintiff Yee's drywall shows levels of carbon disulfide (55 ppb) and carbonyl sulfide (190 ppb)" (Am. Compl. ¶ 15), Plaintiff does not allege that the drywall that reportedly released these gases was National Gypsum drywall.

[5] The Amended Complaint vaguely alleges that Defendants have breached "implied warranties" without stating what "implied warranties" have been breached. (Am. Compl. ¶¶ 32-34).  Although the Amended Complaint's allegations do not remotely plead the elements of a claim for breach of implied warranty for a particular purpose, even assuming that the Amended Complaint could be construed to allege such a claim, Arizona's privity requirement would bar it.  *See Eck v. Helene Curtis Indus.*, 453 P.2d 366, 369 (Ariz. Ct. App. 1969) (noting privity requirement applies to both implied warranty of merchantability and implied warranty of fitness); *Haugland v. Winnebago Indus.*, 327 F. Supp. 2d 1092, 1095-96 (D. Ariz. 2004) (same); *see also Pac. Am. Leasing Corp. v. S.P.E. Bldg. Sys., Inc.*, 730 P.2d 273, 279 (Ariz. Ct. App. 1986) ( "[A] warranty of fitness for a particular purpose will be implied only where the seller has reason to know of 'the particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.'" (quoting A.R.S. § 47-21315)).

QB\10136107.1

1    In addition, Plaintiff has alleged a theory of implied warranty of merchantability
2    that is not cognizable under Arizona law.   Under Arizona warranty law, an implied
3    warranty of merchantability warrants that "the goods shall be at least *fit for their ordinary*
4    *purpose* such that the good would pass without objection in the trade." (emphasis in
5    original) *Nomo Agroindustrial SA DE CV v. Enza Zaden N. Am., Inc.*, 492 F. Supp. 2d
6    1175, 1184 (D. Ariz. 2007) (citing A.R.S. § 47-2314).   In contrast, the Amended
7    Complaint alleges that "[d]efendants implicitly warranted that the product was safe,
8    efficacious, well tested and of high quality." (Am. Compl. ¶ 32).   These assertions
9    overstate the warranty that is implied by operation of Arizona law and therefore allege an
10   implied warranty of merchantability theory that is not cognizable under Arizona law. *See,*
11   *e.g.*, *Nomo Agroindustrial*, 492 F. Supp. 2d at 1185 (requiring plaintiff bringing implied
12   warranty claim to show that goods were not fit for their ordinary purpose).

13   **C.    The Court Should Dismiss Plaintiff's Claims For Unjust Enrichment
        (Count IV) Because Plaintiff's Novel Unjust Enrichment Theory Is Not
14      Cognizable As A Matter Of Law.**

15   Unjust enrichment is "a form of restitutionary relief available upon either 'implied
16   in fact' contract or quasi-contractual grounds." *USLife Title Co. of Ariz. v. Gutkin*, 732
17   P.2d 579, 584 (Ariz. Ct. App. 1989).   To state a claim for unjust enrichment, a plaintiff
18   must establish that "(1) plaintiff conferred a benefit upon the defendant; (2) defendant's
19   benefit is at plaintiff's expense; (3) it would be unjust to allow defendant to keep the
20   benefit." *Parker v. Witasick*, No. 06-903, 2009 WL 3175016, at *10 (D. Ariz. Sept. 30,
21   2009) (citing *Gutkin*).   Plaintiff's unjust enrichment claim fails for several reasons.

22   First, the Amended Complaint alleges that Plaintiff purchased drywall not from
23   National Gypsum but from Lowe's. (Am. Compl. ¶ 4).   Under these circumstances,
24   Plaintiff cannot state an unjust enrichment claim against National Gypsum because
25   Plaintiff did not confer a direct financial benefit upon National Gypsum that National
26   Gypsum could return to Plaintiff in the form of restitutionary relief. *Laborers' &*
27   *Operating Eng'rs Util. Agreement Health & Welfare Trust Fund for Arizona v. Philip*

28

QB\10136107.1

1  *Morris, Inc.*, 42 F. Supp. 2d 943, 951 (D. Ariz. 1999) (dismissing plaintiff's unjust

2  enrichment claim where plaintiff did "not allege it conferred any benefit on [defendant]").

3        Second, Plaintiff's unjust enrichment theory fails because it is pleaded not as a

4  quasi-contractual claim but as a *tort* claim. In essence, the Amended Complaint alleges

5  that National Gypsum would be unjustly enriched if permitted to retain profits it earned

6  from manufacture and sale of allegedly defective drywall. (Am. Compl. ¶ 45). Arizona

7  law does not recognize such a tort-based unjust enrichment theory. *Gutkin*, 732 P.2d at

8  584 (stating that unjust enrichment recovery is "available upon either 'implied in fact'

9  contract or quasi-contractual grounds"). Further, under the *Restatement of Restitution*,

10  "actions of tort are ordinarily not restitutionary . . . [;] they are based primarily upon

11  wrongdoing and ordinarily, through the payment of money, compensate the injured person

12  for the harm suffered by him as a result of the wrongful conduct, irrespective of the

13  receipt of anything by the defendant." *Restatement of Restitution* (1937) ch. 7

14  Introductory Note; *see also Steamfitters Local Union No. 420 Welfare Fund v. Int'l Bd. of*

15  *Painters & Allied Trades*, 171 F.3d 912, 937 (3d Cir. 1999) (dismissing plaintiff's unjust

16  enrichment claim seeking recovery on quasi-tort basis). Therefore, the Court should

17  dismiss Plaintiff's unjust enrichment claim. In all events, Plaintiff has misconstrued the

18  appropriate remedy under an unjust enrichment theory by seeking compensatory damages

19  instead of restitution. (Am. Compl. ¶ 46).[6]

20        Finally, even assuming that Plaintiff could proceed with an unjust enrichment

21  claim premised on a tort theory, Plaintiff's unjust enrichment claim would fail for the

22  same reasons that Plaintiff's tort claims fail. Unjust enrichment is not a separate cause of

23  action that justifies recovery on its own. *Martinelli v. Petland, Inc.*, No. 09-529, 2009 WL

24  _____

25  [6] Contrary to the Amended Complaint's implication, recovery under unjust enrichment is not compensatory but restitutionary. "Restitutionary recoveries are not designed to be compensatory; their justification lies in the avoidance of unjust enrichment on the part of

26  the defendant." *Renner v. Kehl*, 722 P.2d 262, 266 (Ariz. 1986). "Thus the defendant is generally liable for restitution of a benefit that would be unjust for him to keep, even

27  though he gained it honestly." *Id.* Here, recovery of damages to *compensate* Plaintiff for damages allegedly sustained as a result of National Gypsum's alleged conduct are not

28  restitutionary and thus not recoverable under an unjust enrichment theory.

QB\10136107.1

2424655, at \*6 (D. Ariz. Aug. 7, 2009).  Rather, unjust enrichment must be brought about by unlawful conduct as defined by law.  *Id.* (citing *Martis v. Grinnell Mut. Reinsr. Co.,* 905 N.E.2d 920, 928 (Ind. Ct. App. 2009)).  Where the underlying claims supporting the unjust enrichment theory are dismissed, the claim for unjust enrichment should also be dismissed.  *Martis,* 905 N.E.2d at 928.  Because Plaintiff has predicated his unjust enrichment claim on tort theories, and because the tort theories underlying Plaintiff's unjust enrichment claim are deficient, it follows that Plaintiff's unjust enrichment claim should be dismissed.

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Amended Complaint with prejudice.

RESPECTFULLY SUBMITTED this 9th day of April, 2010.

QUARLES & BRADY LLP
Renaissance One, Two North Central Avenue
Phoenix, AZ  85004-2391


By */s/ Alison Pulaski*
Brian R. Booker
Alison Pulaski

*Attorneys for Defendant* New NGC, Inc. d/b/a
*National Gypsum Company*


**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

William H. Anderson
Cuneo Gilbert & LaDuca LLP
507 C Street NE
Washington, DC  20002
wanderson@cuneolaw.com
Attorneys for Plaintiff

QB\10136107.1

1  J. Barton Goplerud
   Hudson Mallaney Shilnder & Anderson PC
2  5015 Grand Ridge Drive, Suite 100
   West Des Moines, IA  50265
3  jbgoplerud@hudsonlaw.net
   Attorneys for Plaintiff
4
   Charles J. LaDuca
5  Cuneo Gilbert & LaDuca LLP
   507 C Street NE
6  Washington, DC  20002
   Charlesl@cuneolaw.com
7  Attorneys for Plaintiff

8  Jack Landskroner
   Landskroner Grieco Madden LLC
9  1360 West 9th Street, Suite 200
   Cleveland, OH  44113
10 jack@lgmlegal.com
   Attorneys for Plaintiff
11
   Andrew A. Lemmon
12 Lemmon Law Firm LLC
   P.O. Box 904
13 Hahnville, LA  70057
   Andrew@lemmonlawfirm.com
14 Attorneys for Plaintiff

15 Michael A. McShane
   Audet & Partners
16 221 Main Street, Suite 1480
   San Francisco, CA  94105
17 mmchsane@audetlaw.com
   Attorneys for Plaintiff
18
   Daniel R. Ortega, Jr.
19 Roush McCracken Guerrero Miller & Ortega
   1112 East Washington Street
20 Phoenix, Arizona  85034-1010
   danny@rmgmo.com
21 Attorneys for Plaintiff

22 Shawn M. Raiter
   Larson King LLP
23 2800 Wells Fargo Place
   30 East 7th Street
24 St. Paul, MN  55101
   sraiter@larsonking.com
25 Attorneys for Plaintiff

26
                                    */s/ Kim Simmons*
27

28

                        -15-
QB\10136107.1